FLEXILIS WERKE, SPEZIAL TIEGEL STAHLGIESSEREI, GESELL-
SCHAFT MIT BESCHRANKTER HAFTUNG et al. v. HESS.

(Circuit Court of Appeals, Third Circuit. June 4, 1913.)

No. 1,725.

1. CONTRACTS (§ 201*)—CONSTRUCTION—CONTRACT FOR SALE OF MANUFACTUR-
   ING PROCESS.

   Plaintiff, a German company, contracted to sell to defendant for $75,-
   000, a part of which was paid, a process for making crucible steel, with
   an exclusive license to use such process in America. It agreed to make
   known to defendant all its "processes, experiences, formulas, practical
   experience, sand mixtures, weight. proportions of smelting materials,
   alloys, compositions, etc.," to send drawings of a plant and a competent
   person to assist in putting it into operation, and instruct in the use of
   the process. By a further provision defendant was obligated under heavy
   penalty to keep the process strictly secret. Defendant subsequently sent
   a practical steel man to plaintiff's plant in Germany to gain such knowl-
   edge of the process as would enable him to conduct defendant's plant
   when built, and on his reports defendant refused to make further pay-
   ments on the contract, on the ground that the process used was old
   and well known. Held, in an action to recover the remainder due un-
   der the contract, that the court correctly instructed that the process sold
   was to be a secret process, and that the right to recover depended on
   whether it was such a process, or was one previously known in the art,
   and properly submitted such question to the jury.

   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 906–912; Dec.
   Dig. § 201.*]

2. TRIAL (§ 257*)—REQUESTS FOR INSTRUCTIONS—TIME FOR SUBMITTING.

   The orderly practice in the conduct of trials in the District Court
   does not permit that. when a jury on its own motion returns to the
   court for further instruction, the case should be again opened for argu-
   ment or the submission by counsel on either side of further points for
   instruction.

   [Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 642–645; Dec. Dig.
   § 257.*]

In Error to the District Court of the United States for the Eastern District of Pennsylvania; James B. Holland, District Judge.

Action at law by the Flexilis Werke, Spezial Tiegel Stahlgiesserei, Gesellschaft mit Beschrankter Haftung (which name translated into the English language is "Flexilis Works, Special Crucible Steel Foundry, Company with limited liability"), and Edwin Bosshardt, against Henry Hess. Judgment for defendant, and plaintiffs bring error. Affirmed.

Duane, Morris & Heckscher, of Philadelphia, Pa., and Dwight P. Dilworth, of New York City, for plaintiffs in error.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Henry P. Brown, of Philadelphia, Pa., Robert F. Rogers, of New York City, and John G. Johnson, of Philadelphia, Pa., for defendant in error.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

GRAY, Circuit Judge. Plaintiffs in error, all of whom were aliens, residents in the city of Berlin, in the German Empire, and subjects of the German Emperor, brought suit in the court below against the defendant in error, a citizen of the state of Pennsylvania and an inhabitant of the Eastern judicial district thereof, to recover damages in the sum of $50,000 for the alleged breach of a written contract, a copy of which is annexed to and made part of plaintiffs' statement of claim. This contract bears the date of August 5, 1908, the first and second articles of which are as follows:

"I. The Flexilis Works agree to hand over and make known to Hess all of their processes, experiences, formulas, practical experience, sand mixtures, weight, proportions of smelting materials, alloys, compositions, etc., referring to the production of crucible steel castings, and especially in reference to crucible steel castings which do not require a malleable lining process, and which immediately after being removed from the moulds, and cooling off and cleaning, are ready to be used and worked. When refined steel and particularly difficult castings are produced, a reheating of not more than five hours shall be required. This obligation exists not only with references to the processes, etc., used at this time, but also in regard to later processes originating from the Flexilis Works, or new methods or improvements which shall come into their possession. If patents are in existence in the territory of license of Hess, or should be taken out, or procured later, the same are to be transferred to Hess without further charge.

"II. The Flexilis Works agree to send, upon request of Hess, Mr. Bosshardt, or, and only in the event of Bosshardt's inability to travel, to send another competent person to the territory of licensee to assist Hess in working out the drawings of the plant, installations, etc., and to help in instructing the employés and workingmen of Hess in the use of the process."

The right and license given for the execution of the process in North America were necessarily exclusive. In consideration thereof, it was agreed that defendant should pay to the plaintiffs $25,000 in cash, upon delivery of the written communications in regard to the formulas, secrets, etc., drawings and transfer of patents existing in the territory of license, and that the balance of $50,000 should be "paid as soon as Mr. Edward Bosshardt, or his substitute, is producing suitable steel castings at the plant of Hess, which are equal in quality to sample castings furnished by the Flexilis Works." It was also agreed that the plant of the defendant must be completed, in accordance with the instructions, recommendations and drawings of the plaintiffs, not later than two years after the execution of the contract. By article VIII of the contract, it was agreed that the same should not be considered as finally concluded until a certain contract between plaintiffs and Fischer, Rosenblatt & Francis, of New York, dated May 27, 1908, was dissolved, such dissolution to be declared by them on or before January 2, 1909. It is admitted that the defendant, in his desire to conclude the contract, agreed to pay, and did pay, an additional sum of $7,500 to procure the cancellation of this contract.

In October, 1908, defendant paid to plaintiffs $25,000 and received from them the written information, instructions, and data relating to the processes and formulas referred to in article I of the written contract, making in all a cash payment of $32,500 paid by the defendant to the plaintiffs. Personal instructions and demonstrations were to be given later by plaintiffs, in America, when defendant had established a foundry, as provided for in the contract. The defendant, in 1908, organized and incorporated a New Jersey corporation, to which he transferred the rights acquired under this contract. On September 9, 1909, a supplemental contract was made between the parties, modifying and amplifying certain terms of the original agreement, and making certain sample castings, accepted and approved by defendant in 1908, the standard, in accordance with which the plaintiffs were obliged to produce castings in the defendant's foundry, when established, before defendant should be obligated to pay the balance agreed upon. After the execution of the first contract, it was understood that defendant, until the completion of his foundry, was to receive steel castings, as he should order the same, from the plaintiffs, for sale by him in America, for the purpose of building up a trade preliminary to the erection of his foundry. There was evidence tending to show that, prior to the summer of 1909, defendant was unable to satisfactorily procure steel castings from the plaintiffs, in order to supply customers and to meet the advertising of these goods which he had made.

In the summer of 1910, defendant sent to Germany one Coyle, a man practically familiar with the steel castings business, and then and afterwards interested in the erection by defendant's corporation of the foundry for the making of steel castings, by the processes obtained from the plaintiffs, or otherwise. By instruction from defendant, and on his behalf, Coyle visited the plaintiffs' works, for the declared purpose of obtaining the information necessary to enable him to understand the processes and to build a foundry and to operate in accordance therewith. He spent about eight weeks in the investigation of the processes and of the operations thereunder. During the period in which he was thus employed, he made numerous and elaborate notes, which have been submitted in evidence in the shape of reports to the defendant. Defendant testified that, from the character of these reports and of verbal communications with Coyle after his return, as well as from investigations independently made about this time by himself, he became satisfied that the process was an old and well known one, containing nothing new or secret; that, instead of being profitable of operation, as had been represented to him by the plaintiffs, or some of them, prior to his entering into the contract, the method had been operated at a considerable loss by the plaintiffs.

Defendant alleges that, by reason of the premises, on the 23d day of November, 1910, he notified the plaintiffs that he would not hold himself obliged to pay the balance of $50,000. On the other hand, Coyle's testimony is criticised by the plaintiff for alleged inconsistencies with his conduct and correspondence during and after the period in which he made his investigations. How far these inconsistencies affected Coyle's credit, and what weight, if any, was to be given to his

testimony as to want of novelty and commercial impracticability of the processes which defendant bargained for and which were communicated by plaintiffs, were properly submitted as issues to be determined by the jury. With the exception of the last two assignments of error, which are not urged and are dismissed without discussion, the assignments deal with alleged errors of commission and omission in the charge delivered by the court below to the jury.

[1] The serious and principal question raised by these assignments, and with which plaintiffs' argument was chiefly concerned, was whether the court erred in instructing the jury that what the plaintiff sold to the defendant was a *secret* process, and that the crucial issue for their determination was, whether the process communicated to defendant under the contract was or was not a secret one, and that if it were, their verdict should be for the plaintiffs, but that if it were not, it should be for the defendant. Plaintiffs in error strenuously insist that the language of the written contract does not sustain the interpretation of the court below, that the process sold by the plaintiffs and bargained for by the defendant was a secret one. In support of their contention, they refer to the first article of the written contract, quoted above, and point out that what was there agreed to be sold and made over by the plaintiffs to the defendant, was "all of their (plaintiffs) processes, experiences, formulas, practical experience, sand mixtures, weight, proportions of smelting materials, alloys, compositions, etc., referring to the production of crucible steel castings," and point out that neither in this nor in any other part of article I, which contains the substance of the agreement, is the word "secret" applied to the processes to be conveyed. They contend that the thing sold was the method practiced by plaintiffs in the production of crucible steel; that, though the different processes or steps in this production may not have been severally new, their particular combination and use by the plaintiffs was peculiar to themselves and constituted the thing which they agreed to sell.

The sixth, seventh and eighth assignments of error deal with that portion of the charge of the court in which the jury were instructed as to the question, whether the process or processes sold by plaintiffs to defendant were secret, or not. As the sixth assignment refers to detached and unrelated portions of the charge, it is only fair to recite in extenso, and in proper connection, what was said by the learned judge of the court below in this regard. At the beginning of the charge, the jury is instructed that the plaintiffs—

"claim that they had a secret process for the manufacture of crucible steel, and they made a written contract with Henry Hess, in which they agreed to deliver to him the secret process and to give him all necessary instructions in connection with it, in the carrying out the manufacture of crucible steel by this process, all the information they possessed with regard to it, for which he agreed to pay them $75,000."

Then, after further stating the tenor of the written contract, and the payment by defendant to the plaintiffs of the sum of $25,000, and the reception by defendant of the instructions and information which were intended to convey to him the secret process which he had purchased, and other matters necessary to a statement of what was sub-

stantially agreed to in the written contract between the parties, and that afterwards, on the 23d day of November, 1910, defendant repudiated the contract by written notice to the plaintiffs, on the ground that there was nothing new in the process which he had purchased, the learned judge continued, as follows:

"The question, then, is whether there is anything new in the process Mr. Hess purchased. That is the question. In addition to the new things which the Flexilis people agreed to sell to Hess, they agreed to instruct him when he built his foundry in the art of using this new process. So that the advantages of the knowledge possessed by the Flexilis management was to go with this new process, if there was a new process, and the instructions and the knowledge and the experience of the management was part of the contract which was to supplement, or which was to be given to the defendant, in order that he might use the new process which he was purchasing to the same advantage that the Flexilis Works were using it. * * * Now, it is claimed that this was a secret process, and it was a process that was being sold here, according to the contract, and along with which was to go the information possessed by Mr. Bosshardt as to the method and manner of successfully using that secret process. That he was ready at any time to give. That information, whether superior or not, is no doubt in existence and ready to go with this secret process, if the defendant should want it, but the important question is, is there a secret process in existence?"

After instructing the jury generally as to what constituted fraud and misrepresentation, sufficient to relieve the defendant from the obligation assumed in the plain terms of a written contract, in a manner to which no exception can be taken, the charge proceeds:

"Where there has been a representation by a party about a thing that is in existence, and where the purchaser had an opportunity to see whether the seller had told the truth, and he failed to take advantage of it, but went headlong into a contract in reference to it, he is bound by it, and he cannot afterwards repudiate it. But, if he purchased a thing which is represented to be a secret, and which he is told is a secret, which secret is to be delivered to him when he pays his money, he cannot find out about the representations made to him by the plaintiffs, as to whether the process is a secret, or not, until he puts it into operation, or gets an expert to find out whether it exists, or in some way ascertain it, where he has no knowledge of the art. * * * He tried, as he contends, to sell these castings to various concerns here in America, and eventually enters into a second contract with regard to it. Is there any evidence that he was in a position to ascertain whether or not the secret which they said they sold him, and which he bought, existed or not, up until he signed the second contract? How could Hess have known, except he had taken those instructions and the contract, and so on, to some experts in the steel business? But, under the law he was not required to do that. He had a right to rely on these plaintiffs for a statement that the secret really existed, and he then no doubt believed it existed, because he was trying to sell, as he claims, these castings to various concerns in this country, and subsequent to that date, picked out what he regarded as a practical man, and sent him over to Germany to learn all about it, in order that he might come back and superintend his works, when he built it and started up the manufacture under this secret process."

The testimony and correspondence of the person (Coyle) thus sent over to Germany is discussed in the charge, and the credit and weight of the same is fairly submitted to the jury, the learned judge saying:

"Coyle wrote a report, and another report, and a letter. You have them all before you, and you can pass on what you think of what he did and how he acted, and what his object was, and what he thought. From all that winding, twisty writing of the two or three reports, you must endeavor to

find out what he thought about it. Did Coyle think there was a secret process? Or what was his object in what he did, in the way he acted, and what he wrote to Mr. Hess? * * * You will take his different writings on the subject, together with all the other evidence in the case, and if from that evidence you find there was undoubtedly a secret process, which was not well known, widely used in the art of crucible steel manufacturing, you will find a verdict for the plaintiffs. If you find there was no such a process, from all the evidence, you will find a verdict for the defendant. If you find there was such a process really existing, a substantial thing, that was not known to the art of crucible steel manufacturing, you will find a verdict for the plaintiffs in the sum which they claim, to wit, the balance of the amount agreed to be paid in the contract. Now, gentlemen of the jury, that is the only question that I propose to leave to you to pass upon. Is there a secret process in existence, and did Hess get it?".

This instruction is reiterated, in dealing, at the close of his charge, with the following point of plaintiffs:

"Mere representations of hopes and expectations made in good faith by the plaintiffs do not constitute fraud or misrepresentation, and will not relieve defendant from the plain terms of his contract, although subsequently they prove to be unfounded."

As to this, the learned judge says:

"That is true, provided there was a secret. That is the sole issue in this case. If there was a secret process, and Hess got it, he must pay for it, whether it is quite as good as he hoped it would be, or not; but, if there was not a secret process, if the various mixtures and proportions and matters of that kind were old and known to the trade, and there was no secret, then the plaintiffs cannot recover."

This is in substance again repeated, in answer to another prayer by the plaintiffs. After the delivery of the charge, counsel for the plaintiff excepted, as follows:

"We also except to the use of the word 'secret,' in connection with the use of the word 'process,' throughout the charge, in the sense that the contract does not provide for the transfer of a secret process, but rather one that they are using. The contract provides that they shall transfer their method of manufacturing castings."

To this the court replied:

"Right on that point, gentlemen of the jury, it is objected that I used in describing the process, the expression 'secret process' throughout the charge. I did that, not because the agreement calls for a secret process in that part of the agreement which describes the process, but in article V of the agreement, it is not affirmatively said to be a secret process, but the defendant is obligated, by a penalty of one hundred thousand marks, not to divulge this secret process, and upon taking the whole contract into consideration, I instruct you that it is a proper interpretation to hold that the plaintiffs were selling, and represented they were selling, to the defendant a secret process for the manufacture of crucible steel, and that the defendant had a right to expect he was getting such a secret process for the manufacture of crucible steel."

This was excepted to by counsel for the plaintiffs, and the exception made the ground for an assignment of error. There were also two or three other exceptions, which were merely a different wording of the general exception to the court's submitting to the jury the question as to whether, or not, a secret process was in existence. No instruction to the jury was asked by the plaintiffs, to the effect that a new,

useful and secret process might consist in or result from a combination of old and well-known elements, nor was any exception taken to the charge for having omitted to give an instruction of that kind to the jury.

By thus submitting to the jury, as it did, the single issue as to the existence of a secret process, the court, favorably to the plaintiffs, eliminated from consideration all other defenses, having previously withdrawn from consideration the claim made by defendant for a certificate of recoupment, or set-off, on account of the $32,000, paid by defendant upon receipt of the formulas disclosing the process. It will be observed that the learned judge, throughout his charge, has referred the qualification "secret" to the process as a whole; that is, to the particular combination in use by the plaintiffs, and not to the subordinate processes or elements thereof.

We think the learned judge was right in construing the written contract as one in which a secret process or method of making crucible steel was the subject-matter thereof. Without dwelling upon what might be called an implication of secrecy arising from the fact that a large sum of money was to be paid for the communication of the process, and that the contract purports to give an exclusive right to manufacture thereunder in the territory of North America, we turn to the language of the fifth article of the contract, referred to by the learned judge of the court below. This article stipulates that the defendant shall "keep strictly secret the process, etc., mentioned in paragraph I, and not disclose to any one the process with the exception of the granting of licenses to others in the territory of license." The article then stipulates with painstaking particularity, that this "secrecy shall extend in particular to the names, ingredients, weight, proportions of the smelting materials, the compositions in all their details and combinations, the mixture of the core sand, steel sand, and the blackening."

Article VI of the contract is as follows:

"In the event of either party to this agreement acting contrary to the conditions and terms of this contract, and particularly as regards the secrecy of the process, such party agrees to pay to the other party a penalty of 100,-000 marks in each case of contravention."

In view of these articles, it would seem impossible to hold that this contract was not dealing with a secret process, or that this secrecy was not stipulated for, as attaching both to the process as a whole, and to the compositions, in all their details, which constituted the combination, and the secrecy of which was essential to the secrecy of the process.

Some time after the jury had retired, they returned to the courtroom and asked for further instructions; that is, that the court would more fully define the meaning of the secret process. In response, the court proceeded, first, to define what is not a secret process, by saying that the mere skill and ability of the management of plaintiffs, in practicing the process, would not constitute a secret process, the plaintiffs having agreed that whatever skill and experience the management shall have, shall go with the secret process. Then, after calling their attention to the question as to what secrecy might or might not attach to the separate steps in the process, the court concludes:

"If the ingredients were known, was there anything in the proportion of the mixture that was entirely new to the crucible steel manufacturing business, which was not known, and which was not used by anybody else? If there was, that would be a secret process, and so all along it would be with all the matters or parts of the process they claimed they have sold. If the evidence shows it contains new ingredients or new proportions, no other crucible steel people knew or have used, it would be a secret. If it does not, it would not be a secret. It makes no difference how skillfully it is used by the Flexilis people. If they know a different proportion to mix the bombs, the scraps, the iron used and the metal used and the sand mixtures, different from other people in the same business, and it so appears in this evidence, and you so find, that would be a secret. If they do not have such a secret, established by the evidence, then they have sold no secret to the defendant and are not entitled to recover."

It seems to us that, in the last two sentences, the court has clearly distinguished between the secrecy that might attach to the elements or steps in the process and the secrecy which might attach to the process as a whole, and directed the attention of the jury again, as it had done throughout the charge, to the point that the secrecy of the process as a whole was the essential fact to be determined by them.

[2] After the court had thus instructed the jury, counsel for the plaintiffs asked that they be further instructed:

"That there is the possibility of a secret process being composed of a combination of well known materials."

Counsel, proceeding to elaborate the instructions thus asked for, was stopped by the court, on the ground that the counsel's opportunity for submitting points had passed, when the case had been submitted to the jury, and the further instruction, as requested, was therefore refused. In this refusal, the court was justified. The orderly practice in the conduct of trials in the District Court does not permit that, when a jury on its own motion returns to the court for further instruction, the case should be again opened for argument, or the submission by counsel on either side of further points for instruction.

After a careful review of the voluminous evidence, we think that there was no injurious error in the charge as excepted to by the plaintiffs.

The judgment below is therefore affirmed.